UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **KELLY YELTON AND STEVEN YELTON, INDIVIDUALLY AND ON BEHALF OF THEIR MINOR CHILDREN, K.D., L.Y., AND L.R.L.Y., ET AL.** | **CIVIL ACTION** |
| | **NO.:  09-3144 C/W 09-3475; 09-3551; 09-3459; 09-3814; 09-3496; 09-3847; 09-4197; 09-04182; 09-4350; 10-0008; 10-1328** |
| **VERSUS** | |
| **PHI, INC. ET AL.** | **SECTION: "J" (4)** |

**ORDER**

Before the Court is a **PHI, Inc. and National Union Fire Insurance Company of Louisiana's Motion for Sanctions (R. Doc. 598)** seeking an order from this Court imposing sanctions against Defendant Sikorsky Aircraft Corporation ("Sikorsky"). Sikorsy opposes the motion. (R. Doc. 632). The motion was heard with oral argument on Wednesday, September 28, 2011.

I.    **Factual Background**

A.    **The Helicopter Crash**

This product liability action arises as a result of the January 4, 2009 crash of a Sikorsky S-76C++ helicopter, N748P, in Terrebone Parish, Louisiana, which caused the death of seven people

and severely injured the only surviving passenger, Steven Yelton.  The accident allegedly occurred as a result of a female red-tailed hawk striking the windshield of the helicopter resulting in a loss of engine power.

The helicopter was owned and operated by Defendant/Cross Claimant PHI, Inc. ("PHI") and manufactured by Sikorsky.  While Sikorsky manufactured the helicopter, the factory-installed windshield was replaced by PHI with a non-Sikorsky after market windshield manufactured by Defendant Aeronautical Accessories, Inc. ("AAI").

Two days after the accident, the National Transportation and Safety Board ("NTSB") began its investigation into the cause of the crash and designated several party representatives who would participate in the investigation.[1]  Christopher Lowenstein, Sikorsky's Chief Air Safety Investigator, was designated as the party representative for Sikorsky.  Mr. Lowenstein participated in the NTSB investigation as Sikorsky's party representative, and oversaw the data exchange between Sikorsky and the NTSB.[2]

**B.**     **The Litigation Hold**

Within a few days of the accident, Sikorsky voluntarily instituted a litigation hold directed to its employees who reasonably and potentially had information and knowledge of the helicopter and the crash.[3]  Dr. Michael Urban, Chief of Structural Methods and Prognostics for Sikorsky, was not included in the litigation hold.  The instant lawsuit was filed on March 26, 2009.

---

[1]Statement of party Representatives to NTSB Investigation, 01/06/09.

[2]Id. at 2; Sikorsky's Response to Magistrate Judge Roby's Order to File Affidavits, Affidavit of Christopher O'Meara Lowenstein.  (R. Doc. 655-1.)

[3]Sikorsky acknowledges that its initial litigation hold was directed to seventeen employees and later expanded to include approximately 100 employees by February 2009.  Sikorsky's Opposition to Plaintiffs' Motion for Sanctions, Ex. G, p. 2 (Declaration of Alan R. Thierfeldt).  (R. Doc. 630-7.)

Around the time the instant lawsuit was filed, Sikorsky had rehired Dr. Wonsub Kim, a Staff Engineer of Structures Methodology and Prognostics.   Phil Potts, Chief Systems Engineer-Safety/Technical Fellow for Safety and Airworthiness & Structural Analyst Representative for Sikorsky, asked Dr. Kim to conduct an analysis of a simulated bird strike event on a S76 aircraft cockpit to help Sikorsky determine the effect of a bird strike on the S76 canopy structure.[4]  Dr. Kim was not advised of the litigation hold at the time he was rehired and asked to conduct the bird strike simulation.[5]

On April 23, 2009, Wayne Lovington, Product Safety, sent an internal email to James Antippas, the in-house attorney handling discovery for Sikorsky, in which he advised him to include "names to the legal hold for the PHI matter."  The email seemingly contained the pasted contents of an earlier email, and included the names of Sikorsky employees who received an earlier email regarding the estimate for the bird strike analysis including, Frank Krzyzanki, S76 Project Engineer-Team Lead, Dr. Wonsub Kim, Eric Hansen, Senior Program Manager, Alan Dobyns[6], and Phil Potts.[7]

## C.    PHI's Discovery Requests

On September 2, 2009, PHI and Plaintiffs propounded their first set of  joint discovery to

_____

[4]PHI and National Fire Insurance Company of Louisiana's Motion for Sanctions, Ex. 1. Dr. Kim originally worked for Sikorsky in 1983.  After working for himself and others for a period of time, he returned to Sikorsky in March 2009.  Sikorsky's Opposition to Plaintiffs' Motion for Sanctions, Ex. M, ¶ 2 (Declaration of Dr. Wonsub Kim).  (R. Doc. 630-13.)

[5]PHI's and Plaintiffs' Supplemental Brief in Support of Motion for Sanctions Against Sikorsky, Ex. 1 (email from Phil Potts, dated 6/23/09).  (R. Doc. 659.)

[6]Dobyns was also involved in the bird strike simulation analysis.  His exact title, however, is unknown.

[7]PHI and National Fire Insurance Company of Louisiana's Motion for Sanctions, Ex.  11(Document labeled SIK 044755) (sealed).  (R. Doc. 598.)

Sikorsky.[8]  Before Sikorsky could respond to the initial discovery, PHI separately propounded discovery consisting of additional interrogatories, requests for production, and seventy-four requests for admissions.[9]

Several of the discovery requests sought information regarding any investigation, testing, analysis or studies performed or commissioned by Sikorsky concerning any failure, malfunction or defect in the S76 windshield, cockpit engine controls, or engine control quadrant throttle lever and low rotor warning system.[10]

### D.    Dr. Kim's Report and Data

On November 30, 2009, Dr. Kim issued an internal report related to his S76 aircraft cockpit structure bird strike simulation and analysis.  In his report, Dr. Kim concluded that a strike involving a 4.0 lb. bird at 136 knots would not stress the windshield beyond the defined stress limits.  He further indicated that he did not model the windshield attachment fastener holds for stress.

Dr. Kim's report also concluded that subject to the testing parameters and set of assumed failure criteria applied in his analysis, the S76 canopy structures failed at and around the impact location.  According to Dr. Kim's simulation, the components that would be damaged were the canopy skin, the upper box sill, and adhesive bond line that attaches to the triangular shaped

---

[8]PHI and National Fire Insurance Company of Louisiana's Motion for Sanctions, Ex. 13; Plaintiffs Joint First Set of Interrogatories and Requests for Production of Documents to Sikorsky Aircraft Corp., Interrogatory Nos. 1 and 6 and Request for Production of Documents Number 70, dated 09/02/09.  (R. Doc. 598-14.)

[9]Plaintiff's Motion for Sanctions, Ex. 5(sealed).  (R. Doc. 619.)

[10]Plaintiffs's Motion for Sanctions, Ex 5 (R. Doc. 619),; PHI and National Fire Insurance Company of Louisiana's Motion for Sanctions, Ex. 16; Objections, Answers and Responses by Sikorsky Aircraft Corp. to PHI Inc.'s Interrogatories, Request for Production of Documents and Requests for Admissions, Interrogatory Nos.10, 11, 23,  47, 48, 49, 65,and 74, dated 03/05/10.  (R. Doc. 619-5.)

4

gusset.[11]

### E.    Sikorsky's Discovery Responses

A review of PHI's discovery requests and Sikorsky's responses reveals that before November 2009, Sikorsky indicated that it had no documents concerning tests or simulation of a bird strike and its impact on a S76.[12]   After that date, Sikorsky routinely objected to producing information and documents related to testing on the basis of overbreath, vagueness, and relevancy.[13] To the extent PHI's discovery requests sought the identity of individuals who participated in post-accident testing, Sikorsky identified Allan Clapp, Allan Lovington, Joe DaSilva, Frank Kryzanski, Phil Potts, Francis Bonomo, and Frederick Brisbois only.[14]

In March 2010, PHI's counsel sent a letter to Sikorsky's counsel, Rick Christovich, noting Sikorsky's efforts to be forthcoming with information and documents, and further indicating that he understood why the document production may be rolling.   PHI's counsel also took issue, however, with Sikorsky's response regarding (1) the readability/viewability and lack of color of some documents produced by Sikorsky; (2) the form of some documents produced by Sikorsky; (3) certain objections raised by Sikorsky; and (4) the incompleteness of Sikorsky's document

---

[11]Id.

[12]Regarding the initial joint request for production which sought information regarding testing and the investigation, Sikorsky responded that it was not aware of any documents as described prior to the occurrence of the accident and it further answered that no specific tests or analysis had been performed.  Id.

[13]Sikorsky objected on the grounds of overbreath, vagueness and repetitiveness.  The Request for Production also sought documents regarding any testing of the S76 windshield, center tee post, cockpit canopy and throttle quadrant failures or malfunctions.  Sikorsky objected to Interrogatory Nos. 11, 12 and Request for Production Nos. 47, 48, 65, and 74, and did not provide any information.

[14]Sikorsky responded to PHI's first set of Interrogatories and Request for Production of Documents on March 5, 2010.  In response to PHI's interrogatories seeking the identity of employees who may have participated in any post-accident testing of the S76 windshield, center tee post, cockpit canopy and/or throttle quadrant area, Sikorsky identified Clapp, Allan, Lovington, Wayne, DaSilva, Joe, Kryzanski, Potts, Bonomo, Francis, and Brisbois.

production.[15]

A few days later, PHI's counsel sent another letter to Mr. Christovich as a supplemental request to Sikorsky to supplement its document production in response to PHI's First Set of Interrogatories, Request for Production of Documents and Request for Admissions to Sikorsky.[16] While not formally requested in its written discovery, counsel for PHI observed that Sikorsky had identified several employees who were involved in the development, engineering, testing and certification of the S76. Based on counsel for PHI's review of some of the documents produced by Sikorsky, counsel for PHI informally requested documents related to fifty-nine additional people, who had information relevant to the crash investigation.[17]

Not satisfied with Sikorsky's response, PHI filed a motion to compel Sikorsky's responses to its requests for production, namely numbers 45, 46, 67, 68, 60, 61, and 69-73.[18] However, PHI did not seek to compel responses to the now important requests for production that requested documents related to Sikorsky's tests of the windshield center tee post, cockpit canopy and throttle quadrant.[19]

## F.    The Court Hearing

During the court hearing on the motion to compel, the parties indicated to the Court that the contested requests for production had been satisfied, as Sikorsky had agreed to provide the

---

[15]PHI and National Fire Insurance Company of Louisiana's Motion for Sanctions, Ex. 18.  (R. Doc. 598.)

[16]PHI and National Fire Insurance Company of Louisiana's Motion for Sanctions, Ex. 19.  (R. Doc. 598.)

[17]Id.

[18]PHI, Inc.'s Motion to Compel Sikorsky Aircraft Corp.'s Responses to Requests for Production of Documents. (R. Doc. 258.)

[19]Sikorsky objected to request for Production Nos.47, 48, 65 and 74, which requested documents related to any post-accident tests.  PHI never compelled responses to these requests.

information in tagged image file format ("TIFF").[20]  However, PHI's counsel indicated that despite PHI's attempts to amicably resolve issues regarding the retention of electronic information, the litigation hold, and the search protocol used by Sikorsky, the parties were unable to do so because Sikorsky refused to respond to PHI's requests.[21]  The Court, in denying PHI's motion to compel, noted that PHI's discovery request did not request the production of litigation hold information.[22]

Upon the request of Sikorsky's counsel, the Court granted it a thirty-day extension to respond to PHI's second set of discovery.  Sikorsky's response was tailored to ferret out information regarding design decisions, and changes to the engine throttle quadrant, the cockpit canopy, windshield, the center tee post and airframe canopy.[23]

Notably, PHI's second set of discovery also sought documents, testimony, analysis, and evaluation regarding the windshield.  Sikorsky objected to PHI's requests on the grounds of broadness, vagueness and burdsomeness.  Sikorsky also objected to producing engineering data documents for the S92 cockpit canopy, center post, windshield and engine control quadrant, which PHI later learned was used in the S76 bird strike computer simulation.[24]

---

[20]On June 16, 2010, PHI's motion was heard with oral argument.  (R. Doc. 292.)  During the hearing, counsel for PHI indicated that Sikorsky had supplemented its response and provided it with color photographs, rendering the request regarding the same moot.  Additionally, the Court was asked to required Sikorsky to produce the documents in searchable or TIFF format, to which Sikorsky agreed, with certain metadata fields included.  During the hearing Kevin. Tully, counsel for Sikorsky, advised the Court that Plaintiffs' requests for spreadsheets and PowerPoints were recently responded to and produced in their native format.  (R. Doc. 598-9.)

[21]Mr. Christovich advised the Court that Sikorsky had instituted a litigation hold and that it included a large number of people.  (R. Doc. 292.)

[22]Id.

[23]Also, counsel for Sikorsky indicated that since the filing of the motion to compel, PHI propounded another set of discovery with an additional thirty interrogatories and requests for production of documents.  Id.  PHI and National Fire Insurance Company of Louisiana's Motion for Sanctions, Ex. 17 (Sikorsky's Aircraft Corp Response to PHI Second Set of Discovery).  (R. Doc. 598.)

[24]PHI and National Fire Insurance Company of Louisiana's Motion for Sanctions, Ex. 17 (Sikorsky's Aircraft Corp Response to PHI Second Set of Discovery).  (R. Doc. 598.)

G.    The Settlement Agreement

While the final report from the NTSB was pending and with discovery responses due to it, PHI entered into a confidential settlement agreement with Plaintiffs. Approximately one month later, Dr. Kim issued a second internal correspondence regarding the bird strike simulation analysis.[25]  On September 17, 2010, PHI sent Sikorsky a second set of discovery in which they requested electronic documents and information, and requested information about Sikorsky's retention process. Sikorsky responded by producing more than seven thousand documents.[26]

H.    The NTSB Report and Dr. Kim's Report

On November 23, 2010, the NTSB released information regarding its findings as to the causes of the accident, and released the aircraft wreckage. The NTSB determined that

> the probable cause of this accident was (1) sudden loss of power to both engines that resulted from impact with a bird (red-tailed hawk), which fractured the windshield and interfered with engine fuel controls, and (2) the subsequent disorientation of the flight crew members, which left them unable to recover from the loss of power. Contributing to the accident were (1) the lack of FAA regulations and guidance, at the time the helicopter was certificated, requiring helicopter windshields to be resistant to bird strikes; (2) the lack of protections that would prevent the T-handles from inadvertently dislodging out of their detents and (3) the lack of a master warning light and audible system to alert the flight crew of a low-rotor-condition.

(R. Doc. 402-1).

On March 9, 2011, Dr. Wonsub Kim's report was released by Sikorsky - some three months

---

[25]This memorandum was written to F.M. Krzyanski and Wayne Lovington and carbon copied to Fran Bonomo, Joe DaSilva, Tim Fox, Joe Lopez, Phil Potts, Cliff Smith and Mike Urban of Sikorsky. PHI and National Fire Insurance Company of Louisiana's Motion for Sanctions, Ex. 15 (Sikorsky's Answers & Responses to Plaintiffs Joint Set of Interrogatories and Request for Production of Documents), dated 10/18/10 (sealed). (R. Doc. 598.) PHI sent a Third Supplemental Request for Production of Documents which were responded to by Sikorsky some nine days later. Discovery continued with the exchange of written discovery requests, responses and production of emails in native format. On February 8, 2011, Sikorsky in responding to AAI's request for a 30(B)6) deposition by indicating that it would produce Phil Potts to testify on the topic of analysis, testing or calculation, and indicating that an acrylic windshield was significantly more susceptible to penetration damage than Sikorsky's glass windshields.

[26]Id.

and fourteen days after the conclusion and release of the NTSB report.[27]  The parties inspected the aircraft wreckage on March 12, 2011.[28]  After Dr. Kim's internal correspondence was produced by Sikorsky, PHI forwarded a letter to Sikorsky requesting that it supplement its responses with the data and documents relied upon by Dr. Kim in his reports.[29]  Supplemental productions of electronic discovery continued as the depositions of Sikorsky's employees progressed.[30]

## I.     Sikorsky's Failure to Place Dr. Kim in the Litigation Hold

On June 3, 2011, Sikorsky's legal department allegedly realized that Dr. Kim's computer had not been placed on a litigation hold and -some two years after he was rehired - forwarded Dr. Kim a litigation hold notice.  On August 2, 2011, during a status conference with U.S. District Judge Carl Barbier, counsel for Sikorsky admitted that there was one witness, Dr. Kim who was never a part of the original litigation hold because he was not employed with the company at the time of the accident.  According to counsel for Sikorsky, Dr. Kim just "slipped beneath the waves."[31]  Counsel for Sikorsky advised Judge Barbier that when Sikorsky realized that Dr. Kim had "slipped beneath the waves" Sikorsky issued him a litigation notice and made his documents subject to the litigation hold.[32]

---

[27]Plaintiff's Motion for Sanctions, Ex. 7; Letter by Ross Cunningham to R. K. Cristovich regarding Sikorsky's Objections, Answers and Responses to Plaintiffs' and PHI's Joint First Set of Interrogatories and Request for Production of Documents.  (R. Doc. 619-4.)

[28](R. Doc. 630.)

[29]Plaintiffs' Motion for Sanctions, Ex. 15; Letter by Janie Joran of Mithoff Law Firm, dated 06/16/11.  (R. Doc. 619-5.)

[30]Depositions of Sikorsky employees began in April 2011.

[31]PHI and National Fire Insurance Company of Louisiana's Motion for Sanctions, Ex. 8; Transcript of Status Conference Proceedings before The Honorable Carl J. Barbier United States District Judge Carl J. Barbier on 08/2/2011 (R. Doc. 598-9.)

[32]     (R. Doc. 598-9.)

As to the instant motion, PHI seeks sanctions against Sikorsky because of its alleged discovery abuses including: (1) failing to identify Dr. Kim in response to written discovery requests in which the identity of persons with knowledge of post-crash testing on the S76 was requested; (2) failing to produce Dr. Kim's reports, which were requested in the initial and multiple subsequent discovery requests propounded to Sikorksy; (3) failing to place Dr. Kim and ninety-eight other Sikorsky representatives in the litigation hold; and (4) failing to produce all of the "RAP" data that was used by Dr. Kim in his bird strike simulation.

## II.   Standards of Review

### A.   Duty to Disclose

Federal Rule ("Rule") of Civil Procedure 26 requires a party to produce non-privileged documents which are relevant to the subject matter involved in the pending action. That requirement embraces documents and information that are reasonably calculated to lead to the discovery of admissible evidence. Fed.R.Civ.P. 26(b)(1).

This broad duty of disclosure extends to all documents that fit the definition of relevance for the purposes of discovery - whether the documents are good, bad, or indifferent. *Danis v. USN Communications, Inc*., No. 98-7482, 2000 WL 1694325, at *1 (N.D. Ill., October 20, 2000). Self-reporting is, in fact, a central concept of the discovery process. The duty of disclosure finds expression in the rules of discovery, and in this Court's Rules of Professional Conduct, which prohibit an attorney from suppressing any evidence that he or his client has a legal obligation to reveal or produce.

The duty of disclosure would be a dead letter if a party could avoid the duty by failing to preserve documents that it does not wish to produce. Therefore, fundamental to the duty of

production of information is the threshold duty to preserve documents and other information that may be relevant in a case. *Danis*, 2000 WL 1694325, at *1. Furthermore, there is no "bad document" exception to the duties of preservation and production. The duties are twin obligations that are a part of the legal system and are applicable to lawyers and parties engaged in litigation.

### B.    Authority for Sanctions

#### 1.    Spoliation

Allegations of spoliation, including the destruction of evidence in pending or reasonably foreseeable litigation, are addressed by federal courts through the court's inherent power to regulate the litigation process if (1) the conduct occurs before a case is filed; or (2) for another reason, there is no statute or rule that adequately addresses the conduct. *See Chambers v. NASCO, Inc.,* 501 U.S. 32, 43-46, 111 S.Ct. 2123, 115 L. Ed. 2d 27 (1991). If an applicable statute or rule can adequately sanction the conduct, that statute or rule should ordinarily be applied, with its attendant limits, rather than the court's more flexible or expansive " inherent power." *Chambers,* 501 U.S. at 50; *see Klein v. Stahl GMBH & Co. Maschinefabrik*, 185 F.3d 98, 109 (3rd Cir. 1999) ("A trial court should consider invoking its inherent sanctioning powers only where no sanction established by the Federal Rules or a pertinent statute is 'up to the task' of remedying the damage done by a litigant's malfeasance . . ."). If the court's inherent power, rather than a specific rule or statute, provides the source of the sanctioning authority, under *Chambers*, the court's ability to sanction is limited by the party's degree of culpability, which must be greater than mere negligence.

In contrast, Rule 37 applies to circumstances in which a party has violated a court order, such as a discovery ruling. Fed.R.Civ.P. 37(b)(2); *Brandt v. Vulcan, Inc*., 30 F.3d 752, 756 (7th Cir. 1994). The Court's own authority encompasses its "inherent power to impose sanctions for abuse

of the judicial system, including the failure to preserve or produce documents." *Barnhill v. United States*, 11 F.3d 1360, 1367 (7th Cir. 1993) (stating that this power stems from a court's authority to manage its own affairs).

Here, PHI does not allege that Sikorsky violated any discovery order or other directive by the Court. Thus, their motions are properly stated pursuant to this Court's inherent powers, and not Rule 37. In order for this Court to impose sanctions under its inherent power, however, it must find bad faith - which is not required under Rule 37. *Sample v. Miles,* 239 F. Appx. 14, 21 n.20 (5th Cir. 2007).

**2.      Delay in Production**

Sanctions may be imposed on a party that, without substantial justification, fails to disclose information required by Rule 26(a) or 26(e)(2). *In re September 11th Liability Insurance,* 243 F.R.D. 114, 125 (S.D.N.Y. 2007) (*citing* Fed. R. Civ. P. 37(c)(1)). A failure to disclose under Rule 37 includes not only spoliation of evidence, but also a party's untimely production of documents and information required to be produced. *Id.* at 125; *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99 (2d Cir. 2002).

**III.   Analysis**

**A.      Sikorsky's Duty to Supplement its Discovery Responses**

In support of their motion, PHI contends that Sikorsky violated its duty to supplement its discovery responses when it learned that its prior disclosure or response was incomplete or incorrect and the additional information produced by Dr. Kim had not been made known to PHI during the discovery process, but failed to supplement its responses. While they point out that Sikorsky also failed to place other employees in the litigation hold, PHI does not contend that this failure resulted

in increased costs.

In opposition, Sikorsky argues that, notwithstanding PHI' allegation that Sikorsky failed to provide sufficient, relevant documents by September 16, 2010 , courts in this District do not issue sanction orders when the complaining party fails to first file a motion to compel.  Sikorsky further argues that PHI waived its  right to seek sanctions against Sikorsky for its failure to produce Dr. Kim's report before March 2011, as they did not file a motion challenging the sufficiency of Sikorsky's objections.  Sikorsky further argues that while their production may have been delayed, it was not denied, as they did eventually produce Dr. Kim's report - albeit two years later.

"A party's failure to supplement an earlier discovery response is sanctionable under Rule 37(c)."  *Robbins & Myers, Inc. v. J.M. Huber Corp.,* 274 F.R.D. 63, 74 (W.D.N.Y. 2011) (quoting James W. Moore, *et al.*, 6 Moore's Federal Practice, Civil § 26.132 (3d ed.1997)).  Federal Rule of Civil Procedure 37 provides:

> if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, *unless the failure was substantially justified or is harmless.* In addition to or instead of this sanction, the court, *on motion and after giving an opportunity to be heard:* . . . may impose other appropriate sanctions . . .

Fed.R.Civ.P. 37(c)(1) (emphasis added).  See *Anderson v. Cryovac, Inc.,* 862 F.2d 910, 929 (1st Cir. 1988) ("once a proper discovery request has been seasonably propounded, we will not allow a party sentiently to avoid its obligations by . . . failing to examine records within its control"); *A. Farber and Partners, Inc. v. Garber*, 234 F.R.D. 186, 189 (C.D. Cal. 2006) (holding that a party has an obligation to conduct a reasonable inquiry in the course of responding to requests for production).

In considering this issue, the Court first notes that Dr. Kim's report was produced only eight months before trial, and almost two years after its creation.  Further, depositions in this case did not

commence until after the NTSB report was issued in November 2010.  In fact, the first deposition was not requested until February 2011.  These depositions resulted in a supplemental production of approximately 7,000 documents, which included Dr. Kim's report.  Therefore, PHI had the benefit of Dr. Kim's report as they proceeded to complete the remaining depositions.  Further the Court notes that the line of cases that suggest a sanction could be available contemplate a complete failure to supplement responses, which is not the case in this matter.

PHI contends that it entered into a settlement that resulted in a greater payment to Plaintiffs than what would have been agreed to had Sikorsky not failed to supplement its discovery responses.  However, the record shows that at the time Plaintiffs and PHI entered into the settlement agreement, Sikorsky had not fully responded to PHI's discovery requests, and PHI's counsel had recently communicated in writing with Sikorsky's counsel regarding the parties' continuing discovery disputes, including Sikorsky's problematic discovery responses.  Thus, the Court is not persuaded that PHI's decision to settle the case for "a larger amount" was due to Sikorsky's actions, but rather PHI's decision was likely due to the normal risks that are attendant in cases of this magnitude.

The record shows that the only discovery motions filed by PHI regarding the sufficiency of Sikorsky's responses failed to challenge Sikorksy's objections to requests for information or documents related to crash test simulations or reports.  Further, during the hearing, counsel for PHI acknowledged that their requests for color photos and production of information in TIFF format had been satisfied, but that he needed to verify the receipt of the documents and information, as he had been out of town and had not had a chance to confirm.

Further, while PHI's counsel attempted to compel information regarding Sikorsky's litigation hold, the record shows that the interrogatories and request for production of documents that were the

14

subject of the motion to compel did not contain a request for such information.  The Court therefore

finds that the delayed production of Dr. Kim's report, which was voluntarily produced - albeit two

years after it was created - does not warrant a finding of sanctions.

### B.    Sikorsky's Duty to Preserve, Retain, and Produce Relevant Documents and Information

In support of their motion, PHI argues that because Sikorsky failed to place Dr. Kim in the

litigation hold when requested in April 23, 2009, Dr. Kim's documents and data files were destroyed

when, in 2010, he was issued a new laptop computer, and his old laptop was "refreshed", the memory

was deleted, and the laptop was sold.  PHI further argues that Sikorksy's key officials knew about

Dr. Kim's project but failed to place him in the litigation hold.  PHI further argues that Sikorsky

intentionally refused to place Dr. Kim and his team in the litigation hold until after Dr. Kim's work

was completed, and critical information and data files were destroyed.

In opposition, Sikorksy argues that it initially voluntarily instituted a litigation hold four days

after the crash, and included seventeen people it was aware of having knowledge of the helicopter

and the crash.  Sikorksy further argues that it clearly advised the recipients of the litigation hold

notice: **"Do not destroy or otherwise dispose of any such documentation."**  Sikorsky further

argues that its litigation hold ultimately extended to approximately 100 Sikorsky employees who

were thought to be potentially "key players" in the case.

Sikorsky further argues that it owed duties to the NTSB investigation, and it was not at liberty

to share investigative information with Sikorsky employees outside of the NTSB team, absent a

compelling need, such as safety considerations.  Sikorsky further argues that all of the parties

involved in the instant litigation were aware of the limitations it was subject to due to the NTSB

investigation, as demonstrated by the Joint Case Management Order No. 1 issued in the case.  (R.

Doc. 140.)

It generally is recognized that when a company or organization has a document retention or destruction policy, it "is obligated to suspend" that policy and "implement a 'litigation hold' to ensure the preservation of relevant documents" once the preservation duty has been triggered. *Goodman v. Praxair Servs.*, 632 F. Supp. 2d 494, 511 (D. Md. 2009) (quoting *Thompson v. United States HUD*, 219 F.R.D. 93, 100 (D. Md. 2003) (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003))); *see Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F. Supp. 2d 456, 466 (S.D.N.Y. 2010) (same); *School-Link Tech., Inc. v. Applied Res., Inc.*, No. 05-2088-JWL, 2007 WL 677647, at *3 (D.Kan. Feb.28, 2007) (same).

As held in *Zubulake v. UBS Warburg* LLC, 229 F.R.D. 422, 432 (S.D.N.Y.2004):

> "A party's discovery obligations do not end with the implementation of a 'litigation hold - to the contrary, that's only the beginning. Counsel must oversee compliance with the litigation hold, monitoring the party's efforts to retain and produce the relevant documents."

*Id.* The court in *Zubulake* set forth several steps that counsel should take "to ensure compliance with the preservation obligation": (1) issue a litigation hold at the outset of litigation or whenever litigation is reasonably anticipated; (2) clearly communicate the preservation duty to "key players"; and (3) "instruct all employees to produce electronic copies of their relevant active files" and "separate relevant backup tapes from others." *Id.* at 433-34. As the *Zubulake* court noted, "[o]ne of the primary reasons that electronic data is lost is ineffective communication with information technology personnel." *Id.* at 434.

Here, just a few days after the incident, Sikorsky communicated a written litigation hold notice to several of its employees whom it believed had relevant information regarding the crash and the helicopter. According to Mr. Antippas, the litigation hold notice was initially sent on January 8,

2009.[33]  Mr. Antippas later sent out the litigation hold notice two more times - before the instant lawsuit was filed - adding another fifty-six people.[34]  After sending out the litigation hold notice, Antippas also contacted Sikorsky's IT Security and Alan Thierfeldt, an e-discovery specialist with United Technology Companies IT Security.[35]

By February 2009, approximately 100 Sikorsky employees computers and files had been placed on the litigation hold.[36]  The custodians were then interviewed and an assessment was made regarding whether each custodian had potentially relevant ESI.  In March 2009, Mr. Thierfeldt managed the first of several collections of information and documents from fifty-six custodians included in the litigation hold.[37]

As mentioned above, around the time the instant lawsuit was filed, Sikorsky rehired Dr. Kim.  However, Dr. Kim was not immediately placed in the litigation hold.  The record shows that Dr. Kim was a  "key player" because he was asked to conduct a simulated bird strike event on a S76 aircraft cockpit - in order to determine the effect of a bird strike on the S76 canopy structure.  Dr. Urban, Dr. Kim's supervisor, surmises, however, that Dr. Kim was not placed in the litigation hold because the study that Dr. Kim was doing was related to Mr. Lowenstein's participation as an NTSB investigator, and because Dr. Kim's involvement was unknown to the legal department at that time.[38]

---

[33]Sikorsky's Opposition Plaintiffs Motion for Sanctions, Ex. J, ¶ 4 (Declaration of James P. Antippas) (sealed). (R. Doc. 630-10.)

[34]Id. at ¶ 5-6.

[35]Id. at. ¶ 7.  However, it is not clear from Antippas' declaration whether Mr. Thierfeldt was contacted after the first, second, or third litigation hold notice.

[36]Sikorsky's Opposition Plaintiffs's Motion for Sanctions, Ex. G.  (R. Doc. 630-10.)

[37]Id. at 6.

[38]Plaintiffs's Motion for Sanctions, Ex. 22 (Excerpts from the Oral Deposition of Michael Urban )(sealed).  (R. Doc. 619.)

However, Mr. Antippas received an email from Mr. Lovington on April 23, 2009 regarding the litigation hold, yet he does not recall taking any action in response to the email.[39]  Interestingly, Mr. Antippas further claims that he did not understand this same communication to be an instruction to place the list of people copied and pasted into the email - including Dr. Kim - in the litigation hold.[40]  Mr. Antippas further claims that he searched his computer, including his deleted files, but did not find Mr. Lovington's April 23, 2009 email.

It was not until some two years after Dr. Kim was rehired that Sikorsky alleges it realized that it failed to include Dr. Kim in the litigation hold.[36]  Specifically, Sikorsky alleges it did not realize that it failed to include Dr. Kim in the litigation hold until Plaintiffs, AAI, and PHI expressed their desire to depose Dr. Kim.  Sikorsky further alleges that it was at that moment that Mr. Antippas realized that Dr. Kim was never forwarded a litigation hold notice.[37]

Mr. Antippas further claims in his declaration that he did not intend to exclude Dr. Kim from the litigation hold and that the failure to include him was just an oversight.[37]  However, Mr. Antippas' declaration does not address the discovery requests which sought the production of documents and information related to any bird strike simulation analysis or testing.  Notably, Mr. Antippas does not suggest that he was unaware of Dr. Kim's involvement in the bird strike simulation analysis.

---

[39]Sikorsky's Opposition Plaintiffs Motion for Sanctions, Ex. J, (Declaration of James P. Antippas) (sealed). (R. Doc. 630-10.)

[40]Id. at. ¶ 14.

[36]Id. at. ¶ 11.

[37]Plaintiffs's Motion for Sanctions, Ex. 20, ¶ 11. (Excerpts from the Oral Deposition of Michael Urban )(sealed). (R. Doc. 619-9.)

[37]Id. at. ¶ 15.

The record shows that once Sikorsky allegedly became aware of its failure to place Dr. Kim in the litigation hold, Mr. Thierfeld was instructed to interview Dr. Kim regarding potentially relevant ESI.  This data was subsequently collected using Guidance's EnCase Command Center from two local hard drives, sent to ACT, an e-discovery processing company, and forwarded in an encrypted native format to PHI's counsel and experts.[38]  According to Mr. Thierfeld, he successfully secured, extracted and produced ***all*** of the electronic data that was located on Dr. Kim's two hard drives.

### 1.      Spoilation

The first issue that the Court must determine is whether any evidence was in fact spoiliated by Sikorsky.  Spoilation is the destruction of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.  To demonstrate that spoliation has occurred, PHI bears the burden of proving the following two elements by a preponderance of the evidence:

> *First,* that *relevant* evidence was destroyed after the duty to preserve arose. Evidence is relevant if it would have clarified a fact at issue in the trial and otherwise would naturally have been introduced into evidence; and

> *Second,* that if relevant evidence was destroyed after the duty to preserve arose, the evidence lost would have been favorable to [PHI].

*Pension Committee of University of Montreal,* 685 F. Supp.2d at 496.

Sikorsky concedes that it failed to include Dr. Kim's computer files and data in the litigation hold, but contends that Dr. Kim just "slipped beneath the waves."  Sikorsky further contends that despite this fact, Dr. Kim was not subject to the litigation hold for approximately two years, it was able to and did actually retrieve all of Dr. Kim's testing data in native format.

---

[38]Plaintiffs's Motion for Sanctions, Ex. 20, ¶ 9 (Excerpts from the Oral Deposition of Michael Urban )(sealed). (R. Doc. 619.)

Dr. Kim testified that after leaving in 1983, he was hired back in March 2009 and asked to head up the bird strike simulation analysis as its lead engineer.[39]  During his sworn deposition, Dr. Kim testified that he does not remember destroying any documents that were contained in his computer.  Yet, he acknowledged that he probably threw some copies of the bird strike documents away.[40]  Dr. Kim further testified that the first time he was instructed to search for, keep, and store documents or data files was in June 2011.  He further testified that he thought he probably transferred the Dytran and Patran finite element models to a folder on Sikorsky's shared drive.[41]

Dr. Kim testified that when he received the litigation hold notice in June 2011, he saved all his emails and PST files.[42] He further stated that as a matter of practice he does not keep every single e-mail that he receives on a particular project.  Instead he only keeps the important ones and deletes the non-important ones daily.[43]

He also conceded that he did not keep all of the hard copy documents related to the bird strike simulation, but that he believed that he kept the majority of them, while some data files were

---

[39]PHI and National Fire Insurance Company's Motion for Sanctions, Ex. 4 (Deposition of Wonsub Kim, 06/28/11) (sealed) (R. Doc. 598); Sikorsky's Opposition to Plaintiffs' Motion for Sanctions, Ex. M, ¶ 2 (Declaration of Dr. Wonsub Kim) (R. Doc. 630-13).

[40]Id. at 34, lines 14-17.

[41]PHI and National Fire Insurance Company's Motion for Sanctions, Ex. 4 (Deposition of Wonsub Kim, dated 06/28/11) (sealed).  (R. Doc. 598.)

[42]Id. at 34.

[43]Id. at 35, lines 4-17.

discarded.[44]  In contrast, in his subsequent declaration, Dr. Kim states that the data files he relied on

were transferred to the shared drive where they were preserved.[45]

       He further conceded that in performing the bird strike simulation analysis, he relied upon the

Dytran[46] and Patran Analysis[47] from a previous S92 bird strike project, in an effort to decrease the

time and costs associated with the instant bird strike simulation analysis.[48]  Although he relied upon

them, Dr. Kim asserts that during a December 8, 2009 meeting with Mr. Potts in which he and Mr.

Potts discussed the bird strike simulation analysis, Mr. Potts advised him not to reference the fact that

he relied on the analysis from the previous S92 bird strike project.[49]  As a result, Dr. Kim deleted any

reference to his March 2010 report from the instant bird strike simulation analysis.[50]  Dr. Kim also

deleted reference to another Sikorsky engineering report.[51]  Dr. Kim further indicated that the

Sikorsky Engineering Report (SER) had a lot of data that was duplicated and available for other

aircraft.[52]  He acknowledged that he could not have completed the instant bird strike simulation

---

[44]Id. at 34, 141.

[45]Sikorsky's Opposition to Plaintiffs' Motion for Sanctions, Ex. M (Declaration of Dr. Wonsub Kim).  (R. Doc. 630-13.)

[46]The Dytran generates the data.  Plaintiff' Motion for Sanctions,  Ex. 27, p. 121 ( Dr. Wonsub Kim's Deposition, dated June 28, 2011)  (R. Doc. 619.)

[47]Patran takes the data and then turns it into a computer-simulated moving picture.  Plaintiff's Motion for Sanctions, Ex. 27, p. 121 ( Dr. Wonsub Kim's Deposition, dated June 28, 2011) (sealed).  (R. Doc. 619.)

[48]Id. at 60.

[49]Id. at 89.

[50]Id.

[51]Id.

[52]Id. at 92.

analysis without access to the SER report, Sikorsky data, the CATIA files, and other drawings.  Dr. Kim did not further elaborate on the significance of the duplicated data.[53]

Dr. Kim further testified under oath that in June 2009, he received a zip file of data and CATIA4 drawing numbers for the left and right windshields.[54]  Dr. Kim acknowledged that he generated spreadsheets, PowerPoint presentations, and Word documents which were kept on the D-drive of his shared folder on his laptop.[55]

Notably, Dr. Kim further testified that in 2009, he kept everything on his laptop in a computer file labeled *Sikorsky 2009/bird strike folder*.  He testified that the data may or may not be there today because, when he received a new computer in 2010, the data on his old hard drive was cleaned out and the computer was sold.  Dr. Kim further testified that, shortly before his old laptop was refreshed and sold, he cleaned out the unnecessary files, kept certain files, and instructed the technician to reserve certain files and transfer them to his new computer.[56]  He did not recall what files and/or data he preserved or what he deleted, but he confirmed that when his computer was refreshed in 2010, some of the files, data, and work product from 2009 were deleted.[57]

Dr. Kim's declaration, which was signed three months after he gave his deposition testimony, directly contradicts his deposition testimony in several respects.  First, his declaration attempts to supplement his deposition testimony by stating that the data files he relied on, which were necessary

_____

[53]Id. at 99.

[54]Id. at 107.

[55]Id. at 140.

[56]Id. at 141.

[57]Id.

for his final conclusions, were transferred to the shared drive and preserved.[58]  Second, he further attempts to supplement his deposition testimony by stating that while he did discard some data Dytran models as he ran various iterations, he only discarded actual data that contained obvious mistakes which were of no value.[59]  He further attempted to explain that he discarded the iterations because they took up a large amount of disk space on his computer.[60]

Notably, in his declaration, Dr. Kim categorically denies destroying any "relevant" data related to the bird strike simulation analysis at issue.[61]  He also tries to explain away his second bird strike simulation analysis of November 30, 2009 as an incomplete draft because he did not have actual parameters, it included approximations data, failed to adequately account for the structural degree of failure, and thus it did not adequately depict real world results.[62]  Dr. Kim further states that his simulation was never intended to predict real world results.[63]  Whereas in his deposition, he testified that the object of the analysis was to determine the effect of a bird strike on the windshield, the canopy and the inertial loads on the quadrant.[64]

---

[58]Sikorsky's Opposition to Plaintiffs' Motion for Sanctions, Ex. M, ¶ 9 (Declaration of Dr. Wonsub Kim).  (R. Doc. 630-13.)

[59]Id. at ¶ 11.

[60]Id. at ¶ 11.

[61]Id. at ¶ 12.

[62]Id. at ¶18, a-d.

[63]Id. at. ¶ 15,

[64]PHI and National Fire Insurance Company's Motion for Sanctions, Ex. 4, p.185, lines 9-18 (Deposition of Wonsub Kim, 06/28/11) (sealed).  (R. Doc. 598.)

In civil cases, courts in this Circuit have regularly held that litigants cannot create a factual issue by contradicting, under oath, a prior sworn statement.[65]  *See, e.g.*, *Avina v. JP Morgan Chase Bank, N.A.*, 413 F. App'x 764, 768 n.6 (5th Cir. 2011) (citing *S.W.S. Erectors, Inc. V. Infax, Inc.*, 72 F.3d 489, 496 (5th Cir. 1996); *Chambers v. Sears Roebuck & Co.*, No. 10-20360, 2011 WL 2392359, at *15 n.54 (5th Cir. June 15, 2011) (citing *In re Hinsley*, 201 F.3d 638, 643 (5th Cir. 2000). Similarly, here, Dr. Kim cannot give clear answers to unambiguous questions in a deposition, and thereafter make contradictory statements in an affidavit, but fail to explain the contradiction.  *See Armstrong v. Rite Aid*, No. 10-1647, 2011 WL 2838829, at *10 (E.D. La. July 14, 2011).

Finally, Dr. Kim points to another technical engineering memorandum issued in 2006 involving a bird strike of a S76 helicopter, which illustrated that the bird impacted the aircraft in the same general area and the windshield was substantially damaged.[66]  Clearly Dr. Kim's statement that this other unrelated engineering report showed that a bird strike caused the windshield to shatter is contrary to the findings of the report he issued in this instance.

The Court concludes that some of the computer files of data used to support Dr. Kim's bird strike simulation analysis were deleted during the two-year period that he was not included in the litigation hold.[67]  The Court further concludes that this evidence was spoliated by Sikorsky.  Thus, PHI has met the first element of the test.

This conclusion is supported by Dr. Kim's acknowledgment of the exchange and discarding

---

[65]While the rule cited here generally occurs in the context of a summary judgment motion or during a trial, the Court concludes that it is appropriate to extend this line of reasoning in the sanctions context.

[66]PHI and National Fire Insurance Company's Motion for Sanctions, Ex. 4, p.185-86 (Deposition of Wonsub Kim, 06/28/11) (sealed) (R. Doc. 598); Sikorsky's Opposition to Plaintiffs' Motion for Sanctions, Ex. M, ¶¶ 11-23 (Declaration of Dr. Wonsub Kim) (R. Doc. 630-13).

[67]PHI's and Plaintiffs' Supplemental Brief in Support of Motion for Sanctions Against Sikorsky, Ex. 1 (Email from Michael Urban to Frank Krzyanski, Francis Bonomo, labeled SIK-044747) (sealed).  (R. Doc. 659.)

of his old laptop, which contained the data he used in the formulation and creation of the bird strike simulation analysis. The Court's conclusion is further supported by Mr. Thierfeldt's affidavit. While he states that he secured all of the data using a particular software and that it contained information contained on Kim's shared network, the Court was not provided with data log sheet which would provide the Court with some information regarding the files contained on the shared network and their corresponding metadata. Of significance is Mr. Theirfeldt's statement that he concluded that all of the electronically stored files and data that Dr. Kim identified were collected.

## 2.   Culpability

Destruction or deletion of information subject to a preservation obligation is not sufficient for sanctions. Bad faith is required. A severe sanction such as a default judgment or an adverse inference instruction requires bad faith and prejudice. *See Condrey v. SunTrust Bank of Ga.,* 431 F.3d 191, 203 (5th Cir.2005); *see also Whitt v. Stephens County,* 529 F.3d 278, 284 (5th Cir.2008) ("[A] jury may draw an adverse inference 'that party who intentionally destroys important evidence in bad faith did so because the contents of those documents were unfavorable to that party.'" (quoting *Russell v. Univ. of Tex. of the Permian Basin,* 234 Fed. Appx. 195, 207 (5th Cir.2007))).

For example, in *GE Harris Railway Electronics, L.L.C. v. Westinghouse Air Brake Co.*, No. 99–070–GMS, 2004 WL 5702740 (D.Del. Mar. 29, 2004), the court concluded that the defendant's employee acted in bad faith by destroying documents that were potentially incriminating. *Id.* at *4. The plaintiff had sued the defendant and its employee for patent infringement and trade secret misappropriation. *Id.* at *1. The parties settled the case and a consent order was entered prohibiting the employee for three years from involvement in selling any radio-based distributed power product manufactured by his employer. *Id.* It was undisputed that the employee was aware of this

prohibition. *Id.* at *2. However, during that three-year period, the employee participated in a proposal to sell the product. *Id.* After the plaintiff learned about this proposal, it moved for a contempt order. *Id.* at *1. The parties did not dispute that the employee deleted computer files related to the proposal when he became aware that the plaintiff might have concerns. *Id.* at *2.

The court concluded that the employee's destruction was "clearly motivated by an intent to eliminate evidence that could potentially incriminate [his employer] in a contempt claim." *Id.* at *4. The court held that dismissal of the case was improper because the prejudice to the innocent party was minimal but adopted an adverse inference against the spoliating party. *Id.* at *4-5.

Here, the evidence submitted leans toward a finding of a significant degree of culpability based on Sikorsky's failure to institute an comprehensive legal hold, which resulted in the destruction of Dr. Kim's data files. In reaching this conclusion, the Court notes that Mr. Antippas received instruction in April 2009 to include Dr. Kim and others in the litigation hold. While Mr. Antippas allegedly does not recall the email, and indicates that he could not find evidence of the email on his computer, this email was not the only clue to him that Dr. Kim's work would be relevant to the litigation. Further, Dr. Kim was seemingly rehired for the express purpose of conducting the S76 bird strike simulation analysis, which should have automatically been a trigger for Sikorsky to issue a notice to Dr. Kim to preserve all of the data he either generated or used in the formulation of the SER.

For example, in-house counsel Kevin Lenihan and Mr. Antippas were aware of and participated in meetings regarding Dr. Kim's bird strike simulation analysis.[68] It defies logic to think that Mr. Antippas, who was responsible for circulating discovery inquires internally to key people, failed to recognize the importance of Dr. Kim's bird strike simulation analysis and the data used in

---

[68] Plaintiffs' Motion for Sanctions, Ex. 37 (Email to Kevin Lenehan & James Antippas, dated 04/30/09). (R. Doc. 619.)

conducting the analysis for over a two-year period.  In fact, the record shows that both Mr. Antippas and Mr. Lenihan were invited via email to a briefing regarding the dynamic structural model of the S76 forward cabin structure as early as August 2007.  This email further indicates that the assessment was for the purpose of improving the throttle quadrant and bird strike capability.[69]

Additionally, while it seems that the bird strike simulation was initially requested to assist with the NTSB investigation, at some point, Mr. Potts decided not to give Dr. Kim's analysis to the NTSB.  The only plausible reason for doing so is because the results of the simulation were not on their face favorable, and therefore adverse to Sikorksy's interests.

The simulation results also raises the specter that Sikorsky did not want the findings, or the data used, to be readily available.  Dr. Kim's deposition testimony underscores the point, as he testified that, on more than one instance, Mr. Potts requested that he delete reference to the S92 data used in his bird strike simulation analysis, and that he complied.[70]

Also of significant concern to the Court is the fact that Sikorsky's engineers, legal team - consisting of the legal specialist and general counsel - ***and*** Sikorsky's lead safety executives were all involved in and were aware of Dr. Kim's simulation and analysis.[71]  The record further shows each of them were involved in responding to discovery requests.  Yet, not one of them thought to preserve Dr. Kim's data files.

Unfortunately, it is impossible to know the extent of the prejudice suffered by PHI as a result

---

[69]Plaintiffs' Motion for Sanctions, Ex.32 (Email by Wayne Lovington, dated 08/21/09).  (R. Doc. 619.)

[70]Id.

[71]Plaintiffs' Motion for Sanctions, Ex. 1 (R. Doc. 619); PHI's & Plaintiffs Supplemental Brief in Support of Motion for Sanctions against Sikorsky(email including Sikorsky engineers and safety personnel regarding the bird strike S76 computer simulation, labeled SIL-004748).  (R. Doc. 659.)

of the loss of Dr. Kim's data files, because they have been permanently lost due to Sikorsky's conduct.  While Sikorsky's e-discovery expert states that he searched Dr. Kim's two hard drives, Dr. Kim testified that he did not recall how much of the data was transferred from his laptop before it was refreshed and sold.  Thus, while Sikorsky's expert indicates he secured and extracted all of the data, it is clear that he was only able to secure and extract the data  available on Dr. Kim's new computer and shared network drive.  Consequently, the volume of missing information remains uncertain, as does its substance.  "Because we do not know what has been destroyed, it is impossible to accurately assess what harm has been done to the [innocent party] and what prejudice it has suffered."  *Pension Comm. of the Univ. of Montreal Pension Plan*, 685 F. Supp. 2d at 478.

Dr. Kim's data files may have been helpful to PHI, or of no value to any party.  As a result of Sikorsky's misconduct and intentional destruction of the data files, however, the Court will never know.  However, given the facts and circumstances presented here, the Court finds that PHI has carried its limited burden of demonstrating that the lost documents would have been relevant.  Undoubtedly, Dr. Kim's data files were created during a critical time period in the litigation.  Further, the record shows that key players at Sikorsky exchanged correspondence related to Dr. Kim's simulation and analysis.  Further, the fact that Sikorsky never admitted in response to PHI's discovery requests the existence of the reports, and indicated that all relevant information had been provided, leaves no serious question about the missing material and its relevance.

## C.    Remedies: Adverse Inference Instructions

Courts agree that a willful or intentional destruction of evidence to prevent its use in litigation can justify severe sanctions.  Courts also agree that the severity of a sanction for failing to preserve when a duty to do so has arisen must be proportionate to the culpability involved and the prejudice

that results.  Such a sanction should be no harsher than necessary to respond to the need to punish or deter and to address the impact on discovery.[72]  "[T]he judge [imposing sanctions] should take pains neither to use an elephant gun to slay a mouse nor to wield a cardboard sword if a dragon looms. Whether deterrence or compensation is the goal, the punishment should be reasonably suited to the crime." *Anderson v. Beatrice Foods Co.*, 900 F.2d 388, 395 (1st Cir. 1990).

A measure of the appropriateness of a sanction is whether it "restore[s] the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) (quotation omitted); *see also Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) ("[T]he applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine.") (quoting *West*, 167 F.3d at 779)).

Extreme sanctions - dismissal or default - have been upheld when "the spoliator's conduct was so egregious as to amount to a forfeiture of his claim" and "the effect of the spoliator's conduct was so prejudicial that it substantially denied the defendant the ability to defend the claim.*" Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 618 (S.D. Tex. 2010) (citing *Sampson v. City of Cambridge, Maryland,* 251 F.R.D. 172, 180 (D.Md. 2008) (quoting *Silvestri,* 271 F.3d at 593)); *see Leon v. IDX Sys. Corp.,* 464 F.3d 951, 959 (9th Cir. 2006) ("The prejudice inquiry 'looks to whether the [spoiling party's] actions impaired [the non-spoiling party's] ability to go to trial or threatened to interfere with the rightful decision of the case.'") (alteration in original) (quoting *United States ex rel. Wiltec Guam, Inc. v. Kahaluu Constr. Co.,* 857 F.2d 600, 604 (9th Cir. 1988))).

---

[72]See Fed. R. Civ. P. 37(e) (sanctions may not be imposed for the inability to produce electronically stored information lost because of the routine, good-faith operation of a party's computer system); *Schmid v. Milwaukee Elec. Tool Corp.,* 13 F.3d 76, 79 (3d Cir. 1994); *Dillon v. Nissan Motor Co., Ltd.,* 986 F.2d 263, 267 (8th Cir. 1993).

When a party is prejudiced, but not irreparably, from the loss of evidence that was destroyed with a high degree of culpability, a harsh but less extreme sanction than dismissal or default is to permit the fact finder to presume that the destroyed evidence was prejudicial.[73]  Such a sanction has been imposed for the intentional destruction of electronic evidence.  Although adverse inference instructions can take varying forms that range in harshness, and although all such instructions are less harsh than so-called terminating sanctions, they are properly viewed as among the most severe sanctions a court can administer.

As explained in more detail below, based on the record in this case, the Court makes the preliminary findings necessary for the spoliation evidence to be submitted, and an adverse inference instruction given to the jury.  While the record presents evidence that some of Dr. Kim's data files are missing, the actual report itself is available to be submitted to the jury for consideration.

The Court also notes, however, that Sikorsky seemingly is now attempting to distance itself from the purpose, intent and results of Dr. Kim's November 2009 report.  The incomplete collection of data files would make it difficult for PHI to provide its experts with sufficient information to be able to test Sikorsky's seemingly new position that the report was a draft and not intended to recreate real world results.

Given the record, it is appropriate to allow the jury to hear the evidence of Sikorsky's deletion of some of Dr. Kim's data files, and its continued denial of the existence of Dr. Kim's simulation, analysis, or the underlying data files.  In light of this ruling, the decision on the degree of and particulars of the adverse inference, as well as the decision to allow the jury an opportunity to consider Sikorsky's conduct is appropriately the responsibility of the District Judge.

---

[73]See FDIC v. Hurwitz, 384 F.Supp.2d 1039, 1099-1100 (S.D.Tex. 2005) (citing *Nation-Wide Check Corp. v. Forest Hills Distribs., Inc.,* 692 F.2d 214, 217-18 (1st Cir. 1982).

### D.     Attorneys Fees

Like an adverse inference instruction, an award of costs and fees deters spoliation and compensates the opposing party for the additional costs incurred.[74]  These costs may arise from additional discovery needed after a finding that evidence was spoliated, the discovery necessary to identify alternative sources of information, or the investigation and litigation of the document destruction itself.[75]

The record here also supports a sanction against Sikorsky requiring it to pay PHI's reasonable costs and attorneys' fees related to Sikorsky's spoliation.  The movers have spent considerable time and money attempting to determine the existence and extent of the spoliation - hampered by Sikorsky's inconsistent and untruthful answers to questions about their knowledge of and involvement in Dr. Kim's bird strike simulation and analysis.  PHI is entitled to recover their costs and attorneys' fees reasonably incurred from the date Sikorsky produced Dr. Kim's report to the present, and related to the parties' investigation of Sikorsky's spoliation, the taking of the additional depositions of witnesses - related to Dr. Kim's report, Sikorsky's failure to preserve Dr. Kim's data files, and the parties' written submissions to the Court related to the subject motion.

## IV.   Conclusion

Accordingly,

**IT IS ORDERED** that **PHI, Inc. and National Union Fire Insurance Company of Louisiana's Motion for Sanctions (R. Doc. 598)** is hereby **GRANTED IN PART AND DENIED**

---

[74]*Rimkus Consulting Group, Inc.*, 688 F. Supp. 2d at 648.

[75]*See, e.g.*, *Pension Comm. of the Univ. of Montreal Pension Plan,* 685 F.Supp.2d at 497 (awarding reasonable costs and attorneys' fees associated with investigating the spoliation and filing the motion for sanctions); *Chan v. Triple 8 Palace, Inc.*, No. 03-6048, 2005 WL 1925579, at *10 (S.D.N.Y. Aug. 11, 2005) ("The plaintiffs are also entitled to an award of the costs, including attorneys' fees, that they incurred in connection with this motion.").

**IN PART:**

- An adverse inference will be given to the jury, as determined by the presiding District Judge;

- PHI's request for monetary sanctions, related to PHI's settlement agreement and payment is hereby **DENIED**;

- PHI is hereby **GRANTED** costs and attorneys' fees, reasonably incurred from the date Sikorsky produced Dr. Kim's report to PHI to the present, related to the parties' investigation of Sikorsky's spoliation, the taking of the additional depositions related to Dr. Kim's report, Sikorsky's failure to preserve Dr. Kim's data files, and the parties' written submissions to the Court.

**IT IS FURTHER ORDERED** that PHI shall file motions to fix attorney's fees into the record by **Wednesday, December 21, 2011**, along with: (1) an affidavit attesting to their attorney's education, background, skills, and experience; (2) sufficient evidence of rates charged in similar cases by other local attorneys with similar experience, skill and reputation; and (3) the documentation required by Local Rule 54.2.  Any opposition to the fee application shall be filed no later than **Friday, December 30, 2011**.  Plaintiff shall notice the motion to fix attorney's fees for hearing on **Wednesday, January 11, 2012**, and the motion shall be heard on that date **without oral argument**.

New Orleans, Louisiana, this 7th day of December 2011.

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**